IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Rome Division

| | | |
|---|---|---|
| **ANTHONY BOBULINSKI**, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| | **)** | |
| **CASSIDY HUTCHINSON,** | ) | **COMPLAINT** |
| | ) | |
| | ) | **Demand for a Jury Trial** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

1.     Plaintiff Anthony Bobulinski ("Mr. Bobulinski") is a decorated Navy veteran who put his country above politics. Because Mr. Bobulinski did not pledge blind loyalty to the Democrat Party and to the Biden family, Defendant Cassidy Hutchinson chose to ultimately viciously defame him.

2.     Defendant cashed in on her brief proximity to President Trump to become the "star" witness of, and in collaboration with, the January 6th Committee and profited from politically left-wing business ventures. In doing so, Defendant has nefariously lied about those with whom she affiliates President Trump.

3.     In one of her business ventures, Defendant released a book in which she defamed Mr. Bobulinski and painted him in a false light. Defendant

did so, in part, by lying about a meeting between Mr. Bobulinski and Mark Meadows, dishonestly portraying it to be unethical and, possibly, illegal. Consequently, Mr. Bobulinski now seeks to hold Defendant accountable for her malicious conduct.

## **Parties**

4.     Plaintiff Anthony Bobulinski is an individual who is not a citizen of Washington, D.C. Indeed, Mr. Bobulinski has never been resident of Washington, D.C., he has never voted in Washington, D.C., nor has he paid income tax in Washington, D.C.

5.     Defendant Cassidy Hutchinson is an individual who is a citizen of Washington, D.C.

## **Jurisdiction & Venue**

6.     This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

7.     Defendant is subject to personal jurisdiction in Georgia pursuant to Georgia's long-arm statute, Ga. Code Ann. § 9-10-91, because she drafted and published the defamatory statements within the state of Georgia, and the subject events occurred in Georgia.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the subject events occurred in this district.

# Factual Background

## *Background of Anthony Bobulinski*

9.      Mr. Bobulinski is a decorated Navy veteran and successful businessman.

10.     For over six years, Mr. Bobulinski was an officer in the United States Navy's elite Naval Nuclear Power Training Command ("NNPTC") as a decorated Master Training Specialist Instructor.  He later served as  the Command's Chief Technology Officer where he held a Q security clearance from the Department of Energy and from the National Security Agency. When he left NNPTC, Mr. Bobulinski was the top-ranked Direct Input Officer ("DIO") in the entire Command in his final Navy Fitness Report ("FITREP").

11.     Mr. Bobulinski's awards and decorations include the Navy/Marine Corps Commendation Medal, the Navy/Marine Corps Achievement Medal, and the National Defense Service Medal.

12.     After his military service, Mr. Bobulinski became involved in business ventures and eventually met Joe Biden in May 2017. Hunter Biden subsequently engaged Mr. Bobulinski as his business partner to serve as the CEO of SinoHawk Holdings, a company designed to find investments in the United States.  Ultimately, a partnership was formed between the Chinese Communist Party/Chairman Ye through their surrogate, China Energy

Company Limited ("CEFC"), a CCP-linked Chinese energy conglomerate, and the Biden family.

13.    Leaked emails eventually raised questions about whether Hunter Biden was profiting off his father's name when he was Vice President of the United States.

14.    The emails showed that Joe Biden was aware of Hunter's business dealings with foreign nations and even personally benefited from them. They contradicted Joe Biden's several prior assertions that he had no involvement with his son's business dealings.

15.    An email dated May 13, 2017, discussed remuneration packages regarding a business deal with a now-bankrupt Chinese company proposing an equity split of "20" for "H" and "10 held by H for the big guy?"

16.    The reference to "the Big Guy" was used by James Gilliar to refer to Joe Biden in emails to maintain confidentiality. Hunter Biden referred to his father as "my chairman."

17.    Mr. Bobulinski, who considers himself to be a political moderate and previously donated to members of the Democrat Party, decided to put principles above political party. He confirmed to the United States Senate the veracity of the emails, that Joe Biden was involved with his son's business dealings with foreign nations, and that the Biden family accepted money from foreign nations.

18.    Indeed, Mr. Bobulinski came forward because of the lies Joe Biden was telling about his involvement with his son's business dealings.

19.    Mr. Bobulinski confirmed that he saw, firsthand, that Hunter Biden would frequently go to his father for his approval or advice for various business deals.

20.    Additionally, during the course of their business relationship, Mr. Bobulinski grew concerned that Hunter Biden was using the Chinese company as his "personal piggy bank," and Mr. Bobulinski needed to take certain steps at the board level to minimize that risk.

21.    On October 22, 2020, Mr. Bobulinski attended the presidential debate.

22.    On November 1, 2020, Mr. Bobulinski attended one of President Trump campaign rallies in Rome, Georgia, and briefly met with Mark Meadows, President Trump's Chief of Staff, during the rally.

*Defendant's Background*

23.    Defendant served as the principal assistant to Mark Meadows when he served as President Trump's Chief of Staff.

24.    Ms. Hutchinson was with President Trump and Mr. Meadows for most of the events on January 6, 2021, and was subsequently subpoenaed by the United States House Select Committee on the January 6th Attack (the "Committee").

25.    After the Committee subpoenaed Ms. Hutchinson to testify, Ms. Hutchinson approached numerous lawyers for representation. It was evident that Ms. Hutchinson was concerned about the expense of such representation. She sought assistance to pay for legal counsel from multiple sources, including a political action committee ("PAC") that supports President Trump, Save America PAC.

26.    Save America PAC confirmed Ms. Hutchinson qualified for funds through a vetting process. Ms. Hutchinson connected with attorney Stefan Passantino and his law partners.

27.    After two interviews with the Committee, a member of the House of Representatives communicated directly with Ms. Hutchinson, knowingly bypassing her lawyer. According to Ms. Hutchinson, the Representative told her that because Mr. Passantino was being paid by a Trump-affiliated third-party, Passantino would not be advancing her interests, but rather, would be advancing those of former President Trump and his allies.

28.    This communication, and other nefarious conduct involving the Committee for which Mr. Passantino has filed his own litigation, unjustifiably undermined Ms. Hutchinson's trust in Mr. Passantino and improperly disrupted their attorney-client relationship.

29.    Thereafter, upon information and belief based upon the sworn testimony of Ms. Hutchinson, Congresswoman Liz Cheney and Counsel Dan

George of the Select Committee established a "backchannel" of communication with Ms. Hutchinson. Ms. Hutchinson provided information, directly or through an intermediary, to the Committee and arranged for the Committee to summon her for a third interview.

30.    After the third interview, Ms. Hutchinson engaged new counsel. Thereafter, she worked with the Committee to arrange for a public appearance on June 28, 2022, which was broadcasted live by all major national cable news organizations, and which was reported prominently by all major national media outlets.

31.    Following her public appearance, Ms. Hutchinson realized the potential for profit and sat for additional media interviews on September 14 and 15, 2022.

32.    During the third and subsequent round of media interviews, Ms. Hutchinson began to tell a story rife with lies for the purposes of advancing her own career and bolstering her precarious financial position.

33.    Ms. Hutchinson published a book and made regular media appearances promoting the lies contained in her book.

34.    Of the many lies Ms. Hutchinson told, perhaps the most egregious was when she asserted that President Trump attempted to grab the steering wheel of "the beast" (a term known to be used in reference to the Presidential limousine) and wrestle control of the vehicle from the Secret Service on

January 6th. President Trump, however, was not in "the beast" on January 6th, and every secret service agent with direct knowledge has refuted Ms. Hutchinson's baseless claim.[1]

35.     Ms. Hutchinson further stated that President Trump grabbed the neck area of Secret Service agent, Bobby Engel. Mr. Engel subsequently, and publicly, stated that was also false.[2]

36.     Among her many lies about her representation, Ms. Hutchinson lied that her attorney attempted to dissuade her from testifying. In now publicly available text messages, Ms. Hutchinson made it clear that she did not want to comply, however, her attorney was encouraging her to comply.[3]

37.     Ms. Hutchinson further lied when she testified that she did not know her attorney had any affiliation with President Trump notwithstanding

---

[1] Jim Hoft, *DEBUNKED! Jan. 6 Committee "Surprise" Witness GETS CAUGHT – US Secret Service Sources DENY Trump Tried to Grab Steering Wheel — ARE WILLING TO TESTIFY!*, GATEWAY PUNDIT (Jun. 28, 2022), https://www.thegatewaypundit.com/2022/06/debunked-jan-6-committee-surprise-witness-gets-caught-us-secret-service-sources-deny-trump-tried-grab-steering-wheel-willing-testify/.

[2] *Id.*

[3] Libby Emmons and Jack Posobiec, *LEAKED: Cassidy Hutchinson text messages CONTRADICT her testimony that her former lawyer instructed her to lie to J6 Committee*, THE POST MILLENNIAL (Sept. 22, 2023), https://thepostmillennial.com/leaked-cassidy-hutchinson-text-messages-contradict-her-testimony-that-her-former-lawyer-instructed-her-to-lie-to-j6-committee#google_vignette.

the fact that she approached Save America PAC for help finding an attorney. Eventually, Save America PAC assisted Ms. Hutchinson to engage Mr. Passantino who had represented several Trump administration staffers who were similarly in need of legal assistance but were struggling financially.

38.     Ms. Hutchinson turned her attention and malignancy towards Mr. Bobulinski by lying about his interactions with Mark Meadows.  She did so intending to profit personally by impugning those who associated with the Trump Administration, regardless how briefly or tenuously.

*Defendants' Defamatory Conduct*

39.     On September 26, 2023, Defendant published a book titled "Enough."

40.     In this book, Defendant lied that Mr. Meadows handed Mr. Bobulinski "what appeared to be a folded sheet of paper or a small envelope."[4]

41.     Specifically, Defendant wrote:

> In the shadows of the bleachers, I observed Mark and Tony Bobulinski's interaction through a gap in the vehicles. When they said their goodbyes, I saw Mark hand Tony what appeared to be a folded sheet of paper or a small envelope. Mark walked toward me, staring at the ground. He was silent for several moments as we made our way back to the staff holding area.
>
> "You and I, we have seen a lot together, done a lot together," Mark said, his head still tilted toward the ground. I cleared my throat.

---

[4] CASSIDY HUTCHINSON, ENOUGH (2023) at 221.

"Yes, Mark. We have." He abruptly stopped walking and stuck his arm out to stop me. Our eyes locked.

"Oh, don't look so frightened." He dropped his arm. "I just want to thank you for working so hard. It's quite difficult to find someone as loyal as you." He flashed a smile, the kind of smile that doesn't change the shape of your eyes. He disappeared around the corner, his Secret Service agents trailing him.[5]

42.     At no point did Mr. Meadows hand Mr. Bobulinski any sheet of paper or envelope. As a direct result of Ms. Hutchinson's lies, Mr. Bobulinski was asked, and answered under oath, questions about this on February 13, 2024, before the House of Representatives Committee on Oversight and Accountability and the Committee on the Judiciary.  Mr. Bobulinski stated, "He didn't hand me a single thing."

43.     Ms. Hutchinson made this accusation to imply that Mr. Bobulinski was involved with some sort of shady business dealing with Mr. Meadows.

44.     Further, Ms. Hutchinson juxtaposed a series of facts in order to create a defamatory implication.

45.     Ms. Hutchinson wrote about the true facts, that Mr. Bobulinski had a meeting with Mr. Meadows during a Trump campaign rally, however, she interposed commentary that gave a defamatory impression.

46.     Specifically, Defendant wrote:

I didn't know much about Tony Bobulinski, just that he was a former business associate of Hunter Biden's and had something to

---

[5] *Id.*

do with the laptop controversy. Trump had brought him as a guest to the presidential debate in Nashville on October 22. I wasn't tracking the story closely enough to know more. But as Mark approached, I had a weird feeling that we were in danger. I couldn't explain it, but the feeling was real. "Mark shouldn't do this," I said to Tony. "He's being set up." Tony shrugged. "Don't overthink things. It's not a big deal. Chief knows what he's doing. Bobulinski came with us to Nashville, remember? Don't worry, kid." He patted my shoulder and walked away as Mark approached me.

"You're not meeting Tony Bobulinski here, Mark. We can send someone from the campaign." I heard my voice whine with childlike desperation. "Please, Mark. This isn't a good idea. Just trust me." Mark looked at his Secret Service agent, then back at me. "Just go find him, and work with Secret Service to find a hidden spot. Come get me once you have him there."

…

"This is really stupid of you, Mark. I don't know what's going on, but it's really stupid," I said. He didn't have time to respond as I ushered him into the makeshift area, away from cameras, as requested, but not from watchful Secret Service eyes.

…

I had done what they had asked of me, not questioning it, but now I started to put together all the moments like this one that didn't add up. I could not shake the feeling that I had been entangled in something far more complex and secretive than I had initially realized.[6]

47.    This commentary, surrounding what was, in fact, an innocent meeting, provided the false implication that Mr. Bobulinski and Mr. Meadows

---

[6] *Id.* at 218-222.

were involved in some sort of nefarious dealings, and painted Mr. Bobulinski in a false and negative light.

48.    Defendant's account is false. In reality, the meeting between Mr. Bobulinski and Mr. Meadows was simply an exchange of pleasantries.

49.    Indeed, once Mr. Bobulinski was thrusted into the public spotlight, which was not his intention, for simply telling his firsthand account of the truth about the Biden family, Mr. Bobulinski became the subject of death threats and he had to move his family into a hotel and hire a former SEAL team as his own security.

50.    When Mr. Bobulinski attended President Trump's rally, he did so as a regular attendee would, not as a VIP guest or invitee, because he simply wanted to see what the rallies were like. At some point, Mr. Meadows, whom Mr. Bobulinski had met one week prior, became aware that Mr. Bobulinski was in attendance, and asked to meet with him for the sole purpose of checking on his and his family's health and safety due to the ongoing threats against them.

51.    At no point during Mr. Bobulinski's meeting with Mr. Meadows did they discuss politics or the Biden family. Mr. Meadows merely checked on the well-being of Mr. Bobulinski and his family.

52.    The meeting occurred in private because Mr. Bobulinski feared for his safety and did not want to be recognized by virtue of meeting with Mr.

Meadows. Ms. Hutchinson's malicious intention to besmirch the character of Mr. Bobulinski was so successful that it not only prompted the foregoing Congressional hearing cross examination, but it also prompted another member of Congress to offensively ask him to confirm, under oath, that he wore a ski mask when he met with Mr. Meadows, which Mr. Bobulinski unequivocally rejected. The belief that he had worn a ski mask to that meeting became so pervasive, as a consequence of Ms. Hutchinson's lies, that memes about it were posted on social media, such as the below, as compared to an actual photo of Plaintiff, a decorated Navy veteran:

 

53. Defendant's defamatory statements about Mr. Bobulinski were knowingly and recklessly false. She was well aware that there was no wrongdoing at this meeting, and that there was no exchange of papers or

envelopes. As Mr. Meadows' principal assistant, Defendant had an insight into Mr. Meadows' meetings, yet she lied about this meeting.

54.    Defendant made the defamatory statements in an attempt to sell her book and obtain further media appearances to bolster her public image.

55.    Defendant did not attempt to conceal her malice toward Mr. Bobulinski, writing that when he was around, she felt she was "in danger."

56.    Defendant further elaborated on the ill-will she felt towards Mr. Bobulinski, writing irrationally that:

> I did not see Mark until Air Force One landed in Fayetteville, North Carolina, for the first rally of the day. We met on the tarmac and I handed him a pack of trail mix. We fell into an uncomfortable silence as he slowly ate. I still had a pit in my stomach from the Tony Bobulinski interaction the night before, but I had a feeling Mark had either already forgotten about it or did not want to talk about it. He crushed the trail mix wrapper and I watched it flutter to the ground as he began to walk in the direction of the overflow crowd. I picked up the wrapper and jogged to catch up with him.
>
> …
>
> I had never been so physically and mentally exhausted in my life, and I was already worried about driving home. But something had shifted in me the night before when I saw Mark interact with Tony Bobulinski, and my unease deepened throughout the day. The version of me that would exchange champagne toasts to presumptively celebrate a second Trump term was inauthentic, but that was the me I had become.
>
> It was a painful realization, one without rationale. I felt heavy with shame that I had been pulled into the center of the political universe, mostly by my own doing. I did not belong on Air Force One, drinking champagne or musing over ball gowns I could not afford. I was consumed with fear that my past had infiltrated the

life I was building. I felt that I had betrayed the world that had made me, and I began to grapple with the question of who I truly was amidst this sea of power and privilege.

As I drove home, I gripped the wheel of my car with both hands and squinted to stay awake. My body had begun to shiver again, ready to collapse, as I wrestled with oppressive self-criticism.[7]

57.    Defendant doubled down on this irrational thought process in an interview on Cable News Network with Jake Tapper. In response to a question from Mr. Tapper asking why Mr. Bobulinski met with Mr. Meadows, Defendant answered "You are asking the same questions I've asked myself since that night."[8] This overwrought, melodramatic response was intended to further create the false impression that a meeting between Mr. Bobulinski and Mr. Meadows was, somehow, inappropriate, unethical and/or even illegal.

58.    It was Defendant's feelings of ill-will toward Mr. Bobulinski and the Trump administration, along with self-promoting her own financial opportunities, that drove her to repeatedly lie about Mr. Bobulinski.

59.    Defendant currently sells hardcover copies of her book for $19.99.[9]

---

[7] *Id*. at 222-227

[8] Transcripts, *Cassidy Hutchinson's Tell-All Book Reveals White House Bedlam; Hutchinson: Trump Is The Most Grave Threat To Our Democracy*, CNN (Sept. 26, 2023), https://transcripts.cnn.com/show/cg/date/2023-09-26/segment/01.

[9] *Enough*, AMAZON, https://www.amazon.com/Enough-Cassidy-Hutchinson/dp/166802828X (last visited Jan. 3, 2023).

**COUNT I**

Defamation

60.    Mr. Bobulinski realleges and incorporates the paragraphs above.

61.    In her book, Defendant defamed Mr. Bobulinski by asserting that Mr. Meadows secretly handed him "what appeared to be a folded sheet of paper or a small envelope."

62.    This allegation is categorically false, and Defendant knew it to be false, or made it with reckless disregard for the truth. Mr. Meadows never gave Mr. Bobulinski any piece of paper or envelope.

63.    Defendant published the defamatory statement in a book and has repeated it in media interviews.

64.    Defendant's defamatory statement was reasonably intended and understood to be a statement of fact, as Defendant, under no uncertain terms, claimed that Mr. Meadows did, in fact, hand Mr. Bobulinski "what appeared to be a folded sheet of paper or a small envelope."

65.    The defamatory statement, combined with her melodramatic and overwrought description of the meeting as being clandestine and fear-inducing, has a defamatory meaning because it creates the impression with an ordinary reader that what was in fact an innocuous interaction between two men was something illicit, immoral, and/or even illegal.

66.    The defamatory statement has directly and proximately caused Mr. Bobulinski to suffer significant damages, including direct damages, damages to his reputation, humiliation, embarrassment, mental anguish, anxiety, and fear for his safety and the safety of his family members, all of which are ongoing in nature and will be suffered in the future. These damages were foreseeable to Defendant.

67.    Defendant, therefore, is liable for compensatory damages.

68.    Defendant's defamatory statement also harmed Mr. Bobulinski's business, including lost opportunities.

69.    Due to Defendant's specific intent to harm Mr. Bobulinski, Defendant is liable for punitive damages because of the wanton and outrageous nature of the defamation.

70.    Defendant acted with actual malice and reckless disregard for the truth, or at the very least, negligent, as demonstrated by Defendant's extreme antipathy, ill-will, and desire to inflict harm on Mr. Bobulinski, her blatant fabrication, her actual knowledge of the falsity of her statement, and her reckless disregard for truth.

71.    As a result of Defendant's conduct, Mr. Bobulinski has suffered damages in excess of $75,000.

**COUNT II**
Defamation by Implication

72.    Mr. Bobulinski realleges and incorporates the paragraphs above.

73.    Defendant juxtaposed a series of true facts, that Mr. Bobulinski met with Mr. Meadows during a Trump campaign rally,  to give the defamatory implication that Mr. Bobulinski was, in fact, involved in illicit, unethical, and possibly illegal activities with Mr. Meadows and the Trump campaign.

74.    This implication was not merely opinion, rather, it was an assertion of fact that something illicit and unethical was happening.

75.    This is a reasonable interpretation because Defendant described feeling like she was in danger once Mr. Bobulinski arrived, that it was a "stupid" idea for Mr. Meadows to meet with Mr. Bobulinski, and that she felt she had "betrayed the world that had made me" because of her knowledge of the meeting Mr. Meadows and Mr. Bobulinski.

76.    The implication was unequivocally false. In reality, Mr. Bobulinski met with Mr. Meadows because Mr. Bobulinski was experiencing death threats and Mr. Meadows wanted to check on his well-being. The meeting was utterly innocuous.

77.    Defendant's defamatory statements were made with actual malice, reckless disregard for the truth, or negligence, as demonstrated by Defendant's extreme antipathy, ill-will, and desire to inflict harm on Mr. Bobulinski.

78.    The defamatory implication has directly and proximately caused Mr. Bobulinski to suffer significant damages, including direct damages, damages to his reputation, humiliation, embarrassment, mental anguish, anxiety, and fear for his safety and the safety of his family members, all of which are ongoing in nature and will be suffered in the future. Additionally, Defendant's false light has caused Mr. Bobulinski to lose business opportunities. These damages were foreseeable to Defendant.

79.    As a result of Defendant's conduct, Mr. Bobulinski has suffered damages in excess of $75,000.

## COUNT III
### False Light Invasion of Privacy

80.    Mr. Bobulinski realleges and incorporates the paragraphs above.

81.    Defendant, through her book and description of Mr. Bobulinski's meeting with Mr. Meadows, gave publicity to matters involving Mr. Bobulinski that unreasonably placed him in a false light and violated his right of privacy. Defendant generated publicity about Mr. Bobulinski that is false.

82.    The false light is highly offensive to any reasonable person because it suggests that Mr. Bobulinski was, in fact, involved in illicit, unethical, and possibly illegal activities with Mr. Meadows and the Trump campaign.

83.    Defendant knew the falsity of the publicized matter and the false light in which she placed Mr. Bobulinski and/or acted with reckless disregard

for the truth or falsity of the publicized matter and the false light in which she placed Mr. Bobulinski.

84.    As demonstrated by Defendant's ill-will towards Mr. Bobulinski, Defendant intended to place Mr. Bobulinski in this false light.

85.    The defamatory implication has directly and proximately caused Mr. Bobulinski to suffer significant damages, including direct damages, damages to his reputation, humiliation, embarrassment, mental anguish, anxiety, and fear for his safety and the safety of his family members, all of which are ongoing in nature and will be suffered in the future. Additionally, Defendant's false light has caused Mr. Bobulinski to lose business opportunities. These damages were foreseeable to Defendant.

86.    As a result of Defendant's conduct, Mr. Bobulinski has suffered damages in excess of $75,000.

## **Prayer for Relief**

WHEREFORE, Plaintiff Anthony Bobulinski demands judgment against Defendant, Cassidy Hutchinson, as follows:

a.    An award of compensatory, special, and punitive damages, as well as disgorgement of any and all income Defendant has made off of her lies about Mr. Bobulinski, in an amount to be proven at trial, but no less than ten million dollars ($10,000,000.00);

b.    Injunctive relief prohibiting the publication or republication of the defamatory statement;

c.    An award of Plaintiff's attorneys' fees and costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

### Demand for Jury Trial

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 4, 2024

ANTHONY BOBULINSKI
*By Counsel*

Respectfully submitted,

*/s/ David Guldenschuh*
David F. Guldenschuh
(Bar No. 315175)
DAVID F. GULDENSCHUH, P.C.
512 E 1st St
Rome, GA 30161
Phone: (706) 295-0333
Fax: (706) 295-5550
Email: dfg@guldenschuhlaw.com

Jesse R. Binnall (*pro hac vice* forthcoming)
Jason C. Greaves (*pro hac vice* forthcoming)
Jared J. Roberts (*pro hac vice* forthcoming)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314

Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jesse@binnall.com
        jason@binnall.com
        jared@binnall.com

*Counsel for Plaintiff*